# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ESTATE OF JUSTIN FIELDS, by
Special Administrator Katrinka Toran,
KATRINKA TORAN, and
BOBBY FIELDS,

                Plaintiffs,

    v.

OFFICER CRAIG NAWOTKA,
CHIEF ARTHUR JONES and
CITY OF MILWAUKEE,

                Defendants.

Case No. 03 C 1450
Judge: Hon. J.P. Stadtmueller

## PLAINTIFF'S MOTION IN LIMINE NO. 1 – PRECLUDING EVIDENCE OF PRIOR INCIDENTS AND ALLEGED BAD ACTS

### INTRODUCTION

The unlawful shooting death of Justin Fields occurred on March 2, 2003. A cursory review of the defendants' motion for summary judgment shows that the defendants will attempt to smear Justin's character at the time of trial with a litany of irrelevant incidents and alleged prior bad acts that stretch back to September 2002. According to the defendants, Officer Nowatka was "justified" in shooting Justin on March 2, 2003, because "Justin Fields was driving drunk, while his driver's license was revoked and … had a warrant out for his arrest. He had dropped out of college months earlier, and had since been displaying odd and aggressive behavior, which included stealing gas and leaving the scene of an automobile accident." (Defs. SJ Reply Br. at 2). Importantly, Officer Nowatka <u>knew none of this</u> on March 2, 2003, the time when he pulled the trigger and killed Justin Fields.

The plaintiff now moves in limine to exclude all irrelevant prior incidents and alleged bad act evidence that predated Justin's death on March 2, 2003, including, but not limited to, the following::

(1) That Justin left college in Arkansas in September 2002 because he felt ill and, while in Milwaukee, it was believed that Justin's ailments were psychological in nature;[1]

(2) That Justin engaged, for a time, in atypical behavior following his return from college. This included Justin's continued complaints of feeling ill, encounters with the Brown Deer Police Department on September 15, 2002, that resulted in Justin's parents filing an involuntary civil Wis. Stat. ch. 51 commitment, during which he tested positive for marijuana use, and an incident in February 2003 in which it was alleged that Justin stole gasoline from a convenience store;[2]

(3) That Justin had a warrant out for his arrest stemming from a prior hit and run accident;[3]

(4) That Justin was driving without a license because his driver's license had been revoked;[4]

(5) That on the night he was shot, Justin could not get into a bar called "1225" on Water Street in Milwaukee because he was previously thrown out of the bar for fighting and throwing a glass at a bartender;[5]

(6) That Justin was drinking alcohol on the night he was shot and his post-mortem blood alcohol concentration was .12%.[6]

## **BACKGROUND**

Justin spent the Summer of 2002 living with his sister (Valerie Fields), his mother (Katrinka Toran), and her then husband (James Toran) at 6110 West Donges Lane in Brown

---

[1] See, e.g., Defendants' Summary Judgment Brief, Proposed Findings Of Facts Nos. 24-26.
[2] See, e.g., Defendants' Summary Judgment Brief, Proposed Findings Of Facts Nos. 26-29, 34, 37-38.
[3] See, e.g., Defendants' Summary Judgment Brief, Proposed Findings Of Facts No. 38.
[4] See, e.g., Defendants' Summary Judgment Brief, Proposed Findings Of Facts No. 37.
[5] See, e.g., Defendants' Summary Judgment Brief, Proposed Findings Of Facts No. 34.
[6] See, e.g., Defendants' Summary Judgment Brief, Proposed Findings Of Facts Nos. 32 and 36.

Deer.  (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 46).  He returned to college at the University of Arkansas – Pine Bluff at the end of August.  (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 47).  Shortly afterwards, Justin called his father, Bobby Fields, who lived near the university, and said he felt sick.  (Thomsen Affidavit, ¶3, Exh. 2, Deposition of Bobby G. Fields dated 11/17/06 at 73-74).  A visit to an emergency room resulted in doctors diagnosing Justin with dehydration.  (Id. at 73 and 78).  Justin then stayed with his father for three or four days, but he wasn't eating.  (Id. at 73).  On September 8, Justin called his mother several times stating that he was sick and wanted to return to Milwaukee.  (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 53-54).  On September 9, the calls increased.  Katrinka made arrangements for Justin to fly back to Milwaukee, and, on September 10, Justin returned home.  (Id. at 54).

Over the next five days, Justin was observed to be acting "different," meaning "he was nervous.  He was jittery.  He felt that something was wrong with his heart, and he was just a different person.  He was kind of like a paranoia."  (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 68-69).  Justin was seen by a medical doctor, Dr. Michael Johnstone, on September 11, for problems including shortness of breath and chest pains.  (Thomsen Affidavit, ¶5, Exh. 4, Deposition of Dr. Michael Johnstone dated 12/13/06 at 9).  Dr. Johnstone found no physical cause for these ailments, and thought it might be that the cause of these problems was psychiatric in origin, possibly anxiety.  (Id. at 9, 12-13).  Justin would sleep in bed with his mother (though, this was something that the

family was accustomed to doing when they weren't feeling well) (Thomsen Affidavit, ¶6, Exh. 5, Deposition of Tiffany A. Brown dated 1/6/06 at 74-75) and he kept looking in drawers in the bathroom for medication to make him feel better. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 77; Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 59). Katrinka tried to check Justin into an emergency room on two separate occasions, but Justin refused to sign himself in. (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 69).

On September 13, at approximately 2:00 a.m., Tiffany called the Brown Deer police because Justin woke up in the middle of the night "started doing some kind of run like walk, high stepping around the house." (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 85). This scared Tiffany, so she called the police, but she later could not explain why she called the police. (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 85; Thomsen Affidavit, ¶6, Exh. 5, Deposition of Tiffany A. Brown dated 1/6/06 at 87). Nothing came of the encounter.

On September 15, Brown Deer police again had interaction with Justin after he left his mother's residence. Justin was apparently upset that his mother would not allow him to drive her car, as his car was still down in Arkansas. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 71; Thomsen Affidavit, ¶6, Exh. 5, Deposition of Tiffany A. Brown dated 1/6/06 at 65 and 90). Justin then started to walk to a friend's house. When police saw him, Justin dove under a tree and police said Justin appeared to reach into his waist band. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 72-73). The officers drew their weapons, and Justin then tried to run into

someone else's house. (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 Dep. at 65).

Following this incident, James Toran, Katrinka and Tiffany later filled out forms for a Wis. Stat. ch. 51 involuntary civil commitment so that Justin could be involuntarily detained. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 73-74). James' statement listed that Justin was a danger to himself and to others, although James later agreed that this was not entirely accurate and was said to get Justin some help. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 80, 83-86). Katrinka also wrote that Justin was suicidal, but she too explained that this was not true. (Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 Dep. at 71). She testified that she wrote that at the behest of a Brown Deer police officer:

> [Justin] was not suicidal. I was trying to get him some help. So that's the only way [the police] said we could get him some help, was to say that we thought he was suicidal, would hurt himself or hurt others. So I wanted him to have help, so I wrote whatever was necessary.

(Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 71-72). Tiffany confirmed that they were told by police when filling out the forms that if they said Justin was a danger to himself, he would likely be diverted from jail to a facility where he could get help. (Thomsen Affidavit, ¶6, Exh. 5, Deposition of Tiffany A. Brown dated 1/6/06 at 74-76 and 101). So, it was said that Justin was suicidal, even though he wasn't. (Id. at 100-01). James testified that the form was drafted as such out of concern for getting Justin help:

> With me, when I see a young man of Justin's age, who is very quiet, very compassionate, a good kid, and I see him, and he's going through something, and I couldn't put my finger on it, and he's agitated. He's upset. And I can't help him because I don't' – can't fix it because I don't know what's broke. That caused me

concern. So as a stepfather, father or as a friend, I would do anything I could to make sure that he was okay, and this is what I did.

(Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 89). Justin was then conveyed over to a psychiatric hospital and stayed there for three days. (<u>Id.</u> at 96; Thomsen Affidavit, ¶2, Exh. 1, Deposition of Katrinka Toran dated 11/16/06 at 95). Marijuana was found in Justin's system but the doctors found nothing wrong with Justin, and he was released shortly thereafter to his mother's custody. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 97-98).

From September 2002 to December 2002, Justin was "pretty quiet" and "trying to work himself out of the situation. He was getting better as time went by." (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 99). As of December 2002, Justin told his father that everything seemed to be getting better, even though he still didn't feel like his old self. (Thomsen Affidavit, ¶3, Exh. 2, Deposition of Bobby G. Fields dated 11/17/06 at 102).

In 2003, the few months' left of Justin's life were mostly uneventful. Towards the end of February 2003, police investigated Justin for stealing gas from a convenience store, but no charges were ever filed. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 103-104). On the plus side, Justin met a girl, Valerie Muza, on February 14, and they exchanged phone numbers. (Thomsen Affidavit, ¶7, Exh. 6, Deposition of Valerie Muza dated 3/19/07 at 7-8). March 1st was supposed to be their first date, but Valerie wasn't feeling well, so she had Justin stop by her apartment for a few hours. (<u>Id.</u> at 9). Valerie allowed Justin to bring a friend with him, Melvin Tunstall, and all of them relaxed as they listened to music and watched a boxing match on television. (<u>Id.</u> at 9). Justin and

Valerie then got to know one another by flipping through old photographs, sharing stories, and otherwise enjoying each other's company. (Id. at 10). Melvin brought a bottle of liquor with him, and Justin did have at least one drink while at Valerie's, but she said that Justin was not drunk. (Id. at 12-14). She testified that Justin was "very aware[,] he … asked me a lot of questions, [and] we conversed in depth … amongst ourselves[.]" (Id. at 13). Justin even taught Valerie how to play chess with a chess board he had in his car. (Id. at 10). When their evening was over, Justin and Melvin left to go to a bar called "1225" on Water Street in Milwaukee. According to Valerie, Justin was nothing but "very, very respectful" of her. (Id. at 11). Justin died a few hours later.

The Milwaukee Police Department's subsequent investigation unearthed that Justin's license was revoked at the time of the accident. (Thomsen Affidavit, ¶4, Exh. 3, Deposition of James Toran dated 2/15/06 at 102). Justin also apparently had a warrant out for his arrest at that time. (Id. at 112). A post mortem blood analysis showed Justin had an alcohol concentration of .12%, just .02 above the legal limit of .10%. (Thomsen Affidavit, ¶5, Exh. 4, Deposition of Dr. Michael Johnstone dated 12/13/06 at 14-15). See Wis. Stat. § 343.63(2m) (2001-02).[7] Further, it was learned that Justin was barred from entering the bar called "1225" on the night he was shot because two to three months prior to March 2, 2003, Justin was banned from the bar because he threw a glass at a bartender. (Thomsen Affidavit, ¶8, Exh. 7, Deposition of Maurice Jones dated 11/10/06 at 45-46).

---

[7] After Justin's death, the legal limit was lowered to .08% by 2003 Wis. Act 30, which was published on July 30, 2003. See 2003 Wis. Act. 30; See also Wis. Stat. § 991.11 (effective date of statutes generally day after publication).

# ARGUMENT

## I. EVIDENCE OF JUSTIN FIELDS' PRIOR INCIDENTS AND ALLEGED BAD ACTS THAT PREDATE THE MARCH 2, 2003 SHOOTING ARE IRRELEVANT AND UNFAIRLY PREJUDICIAL UNDER THE FOURTH AMENDMENT'S REASONABLENESS TEST.

No matter what the Milwaukee Police Department's investigation into Justin Fields' background could unearth, no prior incidents or alleged bad acts are relevant to whether Officer Nowatka used excessive force on March 2, 2003, since it is undisputed that Officer Nowatka knew nothing of them when he shot and killed Justin. The Seventh Circuit has made ringing clear that the Fourth Amendment's reasonableness test "requires that [the officer's] liability be determined exclusively upon an examination and weighing of the information [the officer] possessed immediately prior to and at the very moment he fired the fatal shot." Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988). Anything else that is added to the equation is irrelevant and unfairly prejudicial. Id.

In Sherrod, an officer approached a robbery suspect's car. The officer saw the suspect make a "quick movement with his hand into his coat as if he was going to reach for a weapon." Id. at 806. The officer shot and killed the suspect, but it turned out that the plaintiff was unarmed. At trial, the district court allowed into evidence the fact that the plaintiff had no weapon, and the jury found the officer violated the plaintiff's Fourth Amendment rights. The Seventh Circuit reversed the judgment, holding that the district court committed reversible error by allowing into evidence the fact that the plaintiff was unarmed. The Seventh Circuit held that "[w]hen a jury measures the objective reasonableness of an officer's action, it must stand in *his* shoes and judge the reasonableness of his actions based upon the information he possessed and the judgment he exercised in

responding to that situation." Id. at 804-05. "Knowledge of facts and circumstances gained after the fact," the Seventh Circuit continued, "has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment." Id. at 805. Any evidence "beyond that which [the officer] had and reasonably believed at the time he fired his revolver is improper, irrelevant, and prejudicial to a determination of whether [the officer] acted reasonably 'under the circumstances.'" Id. Ultimately, the court held that whether the plaintiff was armed was irrelevant, since the focal fact question was whether the officer's belief that the plaintiff was reaching for a weapon was objectively reasonable. Id. at 807.

While the officer in Sherrod benefited by having harmful evidence excluded (i.e., the fact that the plaintiff was unarmed), the Seventh Circuit made clear in later decisions that "the rule in Sherrod applies both ways," in that evidence that is harmful to the plaintiff must likewise be excluded. Palmquist v. Selvik, 111 F.3d 1332 (7th Cir. 1997).

In Palmquist, a case that is analogously on point, police responded to a 5:00 a.m. call regarding a raving individual that threatened a passersby and was brandishing a sharp rusty muffler pipe and fan blade. Upon arrival, the officer found that the plaintiff was incoherent, rambling about Vietnam, the Viet Cong, and his war colonel. As the plaintiff got more agitated, the police ordered the plaintiff to drop his weapons. He refused saying "you'll have to shoot me", advanced on the officers, and was shot and killed. The subsequent investigation into the plaintiff's background revealed a number of damaging prior incidents and alleged bad acts, including the following:

- A friend of the plaintiff said that the plaintiff started mentally unraveling about six months prior to the shooting and was heavily drinking and smoking marijuana. The friend also said the plaintiff was very depressed;

- The month before the shooting, the plaintiff's depression and his drinking had worsened as he stewed after losing two jobs as a mechanic. The plaintiff also told another friend that he wanted to die, while he told a neighbor that he wanted to be shot by the police;

- The day before the shooting, the plaintiff told still another friend that he would provoke the police to kill him. This actually prompted the friend to call the police;

- The night before and the early morning hours of the shooting, the plaintiff yelled in his apartment, screamed obscenities, walked the perimeter of the property, and threw junk.

- The day of the shooting, the plaintiff was drinking alcohol and, hours before being shot, was stopped and cited for drunk driving and possession of marijuana;

- After the citations were issued, the plaintiff went home, howled at the moon, screamed at a next-door neighbor, imitated the "Three Stooges," and ranted about microwaves, supposedly so someone would call the police.

Id. at 1338. Following the decision in Sherrod, the district court barred all of the above evidence in that it had no bearing on whether the officers acted reasonably. Id. at 1339. The district court ruled that the jury would determine whether the officers acted reasonably based on "the officer's personal knowledge—their experiences and observation—during the morning in question." Id. at 1339. The jury found that the officers acted unreasonably and violated the plaintiff's Fourth Amendment rights. The officers appealed, claiming that the district court should have admitted into evidence the above facts because they claimed it was relevant to the plaintiff's "motive" and "intent" to die by "suicide by cop." The Seventh Circuit disagreed and affirmed the jury's verdict.

The Seventh Circuit confirmed that "**Sherrod states the law in this circuit: when considering a charge of excessive force under the Fourth Amendment, evidence outside the time frame of the shooting is irrelevant and prejudicial**." Id. at 1339 (emphases added). The Seventh Circuit went on to write that

> **The rule of Sherrod applies both ways**. In the original opinion it excluded evidence which could have been damaging to Berry, the shooting officer. Here the exclusion arguably works against the police by rendering inadmissible one explanation for the events of April 23, 1990. The magistrate judge correctly relied on Sherrod and its circumscription of admissible evidence. The excluded evidence would have shifted the jury's attention from [the plaintiff's] behavior at the scene, which is material in judging the objective reasonableness of [the police officer's] use of force, to information not possessed by [the police officer], such as [the plaintiff's] mental state and his physical behavior before the encounter. … **[E]vidence relating to the plaintiff's mental and emotional state and past actions is not admissible in judging the use of excessive force**.

Id. at 1340 (emphases added). The court held that the district court properly applied Sherrod to preclude all the prior bad act evidence "because the excluded evidence in this case occurred outside the presence of the police, [so] they had no personal knowledge of it." Id. at 1340. See also Wallace v. Mulholland, 957 F.2d 333, 336 (7th Cir. 1992) (evidence of plaintiff's schizophrenia excluded from evidence because "the police officers had no specific knowledge of [the plaintiff's] condition before they tried to take him away. The … evidence [of the plaintiff's schizophrenia] would have shifted the focus from [the plaintiff's] actions to his condition. Only his actions can justify the use of force.").

Applying Sherrod, Palmquist, and Wallace, the defendants cannot showcase Justin Fields' past and alleged prior bad acts to argue that Officer Nowatka acted reasonably when he pulled the trigger. Whether Officer Nowatka used excessive force is to viewed through a reasonableness lens while peering at the facts and circumstances known to Officer Nowatka, i.e. the time frame from the start of their encounter on Water Street Until the time he pulled

the trigger. Therefore, evidence of Justin's prior mental health issues is irrelevant and unfairly prejudicial. Palmquist, 111 F.3d at 1340; Wallace, 957 F.2d at 336. Evidence of Justin's prior police contacts, that Justin may have been driving without a license, and that Justin had a warrant for his arrest is irrelevant and prejudicial. Sherrod, 856 F.2d at 805 ("[E]vidence beyond that which [the officer] had and reasonably believed at the time he fired his revolver is improper, irrelevant, and prejudicial to a determination of whether [the officer] acted reasonably 'under the circumstances.'"). And the fact that Justin tested positive for marijuana use in September 2002, that he was drinking alcohol on the night he was shot, and that a post mortem blood analysis showed a BAC of .12% is irrelevant and unfairly prejudicial. Palmquist, 111 F.3d at 1338-40. The Seventh Circuit is clear that "[i]t is no defense to [the plaintiff's excessive force claim] that [the plaintiff] may have, in some sort of vigilante-like way, gotten what he had coming to him." Klein v. Vanek, 86 F.Supp.2d 812 (N.D. Ill. 2000).

## II. EVIDENCE OF JUSTIN FIELDS' PRIOR INCIDENTS AND ALLEGED BAD ACTS THAT PREDATE THE MARCH 2, 2003 SHOOTING ARE INADMISSIBLE WITH RESPECT TO JUSTIN FIELDS' CLAIMS FOR DAMAGES.

Following this Court's order granting in part and denying in part the defendants' motion for summary judgment, the plaintiff's damage claims have been winnowed down to his Estate's claims for conscious pain and suffering, funeral expenses, loss of life, and loss of earning capacity. This Court should rule that all of the above evidence is also inadmissible on Justin Fields' claims for damages.

None of the above evidence has any bearing on Justin's loss of life damages. "The loss of life means more than being deprived of the right to exist, or of the ability to earn a

living; it includes deprivation of the pleasures of life." Frye v. Town of Akron, 759 F.Supp. 1320, 1326 (N.D. Ind. 1991); Sherrod v. Berry, 629 F.Supp. 159 (N.D. Ill. 1985) rev'd on other grounds 856 F.2d 802 (7th Cir. 1988) (discussing loss of life damages). It "describes the concept as encompassing everything from the fleeting joy derived from staring adoringly into an infant's smiling face to the more deep-seated satisfactions involved in enduring life's hardships." Ayers v. Robinson, 887 F.Supp. 1049, 1051 (N.D. Ill. 1995) (same). To potshot the value of life with targeted isolated instances of prior conduct ignores the purposes of hedonic damages: to compensate for "the larger value of life." Sherrod, 629 F.Supp at 163. Further, if the above evidence has any bearing on Justin's claim for loss of life, that evidence is severely unfairly prejudicial under FRE 403 insofar as it wrongly encourages the jury to harbor adverse sentiment against Justin for a few specific incidents or acts. See, e.g., Meller v. Heil Co., 745 F.2d 1297, 1303 (10th Cir. 1984) ("It appears that [the defendant] sought to introduce [the decedent's possession of drug paraphernalia] for the specific purpose of arousing juror sentiment against the decedent. The district court clearly acted properly in excluding this evidence.").

The above evidence likewise has no bearing on the conscious pain and suffering Justin felt as he died from the gunshot wound. The defendants have named no expert that could establish a causal link between any of the above evidence and Justin's ability to feel pain. Indeed, the only expert to opine on the issue of conscious pain and suffering was Milwaukee County's own medical examiner, Dr. Jeffrey M. Jentzen. He opined that "[b]ased on my experience with other similar cases, the decedent would have survived at least thirty

(30) seconds to a minute or two" after being shot. (Jentzen report). At his deposition, Dr. Jentzen supported his opinion by explaining:

> Q   And what is that opinion based upon, aside from your experience, but what about Mr. Field's injury led you to reach that opinion?
>
> A.   Mr. Fields had a gunshot wound which entered his left chest cavity, struck his heart, and went through the right lung before exiting his chest cavity and the bullet was recovered in the skin. …
>
> He had an accumulation of 1500 milliliters of blood in his chest cavity, and the bullet did not disrupt the spinal cord or any other portions of the central nervous system or other major blood vessels that would have caused him to die instantaneously.
>
> And it would be my opinion that he bled, that he lost – aggressively lost blood and that he had – or he was able to do voluntary movements for at least 30 seconds to a minute or two, and that he was a live during that period of time.
> …
> Q   … And would he have been in pain during this 30 seconds to a minute or two?
>
> A   In my opinion, he would have been, yes.

(Thomsen Affidavit, ¶9, Exh. 8, Deposition of Jeffrey M. Jentzen, M.D. dated 12/18/06 at 12-13). Further, after Justin was shot, the passenger in Justin's vehicle, Melvin Tunstall, testified that he heard Justin exclaim "he shot me" and then saw Justin "holding his side," all evidence that Justin felt pain. (Thomsen Affidavit, ¶10, Exh. 9, Deposition of Melvin D. Tunstall dated 6/29/05 at 68 and 71). Because the defendants have no expert to link any of the above evidence to these claims of damages, the above evidence is substantially unfairly prejudicial, confusing and grossly misleading under FRE 403.

Finally, none of the above evidence is relevant to Justin's claim for loss of earning capacity. Here again, the defendants have offered no expert that could substantiate whether any of the evidence would be relevant to estimating Justin's economic losses. If the

defendants wanted to link either Justin's alleged mental health issues, police contacts, or isolated drug and alcohol use to lower Justin's economic damages, that required occupational expert testimony. See, e.g., Mankey v. Bennett, 38 F.3d 353, 357-360 (7th Cir. 1994) (use of plaintiff's medical/mental treatment to show deceased life expectancy and earning capacity requires expert testimony); id. at 360 ("With no expert to lay a foundation and tie the substance abuse to an impact on [the plaintiff's] life expectancy and ability to earn an income, such evidence [of drug abuse and prior mental health treatment] was not admissible."); Meller, 745 F.2d at 1303 ("[The defendant] sought to admit the [decedent's possession of drug paraphernalia] at trial, claiming that they were probative of the decedent's life expectancy and that they impeached prior testimony by the plaintiff. The district court excluded the pipes, concluding that their probative value was substantially outweighed by the danger of unfair prejudice. We agree. [The defendant] provided no medical foundation for its claim that [the decedent's] life expectancy was diminished by drug use.")[8] Even so, this information would otherwise be unfairly prejudicial under FRE 403 in that it arouses unfavorable sentiment without any substantial basis. See, e.g., id. at 745 F.2d at 1303; Gust v. Jones, 162, F.3d 487 (10th Cir. 1998) (any relevance that prior convictions would limit employability was substantially outweighed by the danger of unfair prejudice). As such, all of the above evidence is inadmissible on the plaintiff's claims for damages.

---

[8] Prior arrests or contacts with the police would still be inadmissible. Medrano v. City of Los Angeles, 973 F.2d 1499 (9th Cir. 1992) ("Fed.R.Evid. 609 does not allow the use of prior arrests for purposes of impeachment.").

## CONCLUSION

The plaintiff now moves in limine to exclude all prior bad act evidence that predated Justin's death on March 2, 2003, including, but not limited to, the following:

(1) That Justin left college in Arkansas in September 2002 because he felt ill and, while in Milwaukee, it was believed that Justin's ailments were psychological in nature;

(2) That Justin engaged in atypical behavior following his return from college. This included Justin's continued complaints of feeling ill, encounters with the Brown Deer Police Department on September 15, 2002, that resulted in Justin's parents filing an involuntary civil Wis. Stat. ch. 51 commitment, during which he tested positive for marijuana use, and an incident in February 2003 in which it was alleged that Justin stole gasoline from a convenience store;

(3) That Justin had a warrant out for his arrest stemming from a prior hit and run accident;

(4) That Justin was driving without a license because his driver's license had been revoked;

(5) That on the night he was shot, Justin could not get into a bar called "1225" on Water Street in Milwaukee because he was previously thrown out of the bar for fighting and throwing a glass at a bartender;

(6) That Justin was drinking alcohol on the night he was shot and his post-mortem blood alcohol concentration was .12%.

Dated at Brookfield, Wisconsin this 29th day of August 2008.

**CANNON & DUNPHY, S.C.**
Attorneys for Plaintiffs


By: ___/s/ Mark L. Thomsen___
Mark L. Thomsen, Bar No. 01018839
Sarah F. Kaas, Bar No. 1027895
Brett A. Eckstein, Bar No. 1036964
595 North Barker Road; P.O. Box 1750
Brookfield, WI 53008-1750
Telephone: (262) 796-3703
Facsimile: (262) 796-3713